The Memorandum Decision and Order below is hereby
signed.  Dated: June 24, 2008.



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| THEODORE MILES, | ) | Case No. 04-01128 |
| | ) | (Chapter 7) |
|         Debtor. | ) | |
| _____ | ) | |
| | ) | |
| BRYAN ROSS, TRUSTEE, | ) | |
| | ) | |
| | ) | |
|         Plaintiff, | ) | |
| | ) | Adversary Proceeding No. |
|     v. | ) | 07-10000 |
| | ) | |
| CARLOS SAENZ, *et al.*, | ) | Not for Publication in |
| | ) | West's Bankruptcy Reporter |
|         Defendants. | ) | |

MEMORANDUM DECISION REGARDING
PENDING MOTIONS FOR SUMMARY JUDGMENT

This addresses the motions for summary judgment filed by the
defendant Carlos Saenz and the defendant Long and Foster Real
Estate, Inc. ("Long & Foster").  This supplements my oral
decision of June 10, 2008, to elaborate on the grounds for
granting those motions.

I

The plaintiff seeks monetary damages for breach by the
defendant Saenz of an alleged contract calling for him to
purchase real property, and for alleged fraud in his representing
that he had made a deposit on that contract when he had not.  The
plaintiff also seeks damages against Long & Foster regarding the
deposit, and for failing to take steps to complete the sale.

The essential background facts are undisputed.  Theodore
Miles is the debtor in the bankruptcy case within which this
adversary proceeding has been pursued.  His case began as a case
under chapter 13 of the Bankruptcy Code, and he commenced this
adversary proceeding while the case was pending in chapter 13.
After the case was converted to chapter 7, Bryan Ross was
appointed chapter 7 trustee, and he is now prosecuting the
adversary proceeding on behalf of the bankruptcy estate.

When the case commenced, Theodore Miles, his mother, Erma
Miles, his sister, Clementine Miles Parker, and his brother,
Ricardo Miles, were the owners of real property known as 901
North Carolina Avenue, S.E., Washington, D.C. (the "Property").
Ricardo Miles is represented in the bankruptcy case and its
proceedings by a guardian *ad litem*, Jeffrey M. Sherman.

Although not pertinent to my reasoning in concluding that
summary judgment is appropriate, it is noted that Harry Gough
appeared in the land records to be an owner of the Property as of

2

the time that Saenz made an offer (discussed below) to purchase the Property.  The court later entered an order in the bankruptcy case which established that Gough was not to be treated as an owner, and he will thus not be treated as an owner in this decision (but of course his purported interest in the Property *was* a cloud on title).

While the bankruptcy case was still pending in chapter 13, Theodore Miles sought to sell his fractional interest in the Property, and apparently the interests of his co-owners as well, by employing Diane M. Bailey of Long & Foster.  On September 24, 2005, Saenz submitted to Bailey an offer (the "Offer") to purchase the Property on Long & Foster's standard Regional Sales Contract form typed up by Bailey to which Saenz added handwritten terms before signing it.  Saenz was not aware that Theodore Miles had a bankruptcy case pending.  The offer identified "Erma G. Miles, Theodore Miles, [and] Ricardo Miles ('Seller')" as the other parties to the proposed contract.  (Through apparent error by Bailey, Clementine Miles Parker was not included as a Seller.) Significantly, Saenz's handwritten terms included "48 hour response time required."[1]

---

[1]    Although not material to the summary judgment issues, it is noted that the offer additionally reflected that no financing was going to be obtained, and that the offer was thus not contingent on financing.  Saenz left blank the spaces on the Regional Sales Contract form for reciting the amount of financing, and he added the handwritten terms "all-cash offer" and "not contingent."

3

The offer recited at paragraph 5 ("Deposit") that:

>     A.   The Purchaser has made a deposit ("Deposit")
> with Long & Foster ("Escrow Agent") of $125,000 by
> check . . . receipt of which is hereby acknowledged.
>     B.   The Deposit will be placed in an escrow
> account of the Escrow Agent **after Date of Ratification**
> to conform with the laws and regulations of the
> appropriate jurisdiction . . . .  This account may be
> interest-bearing and all parties waive any claim to
> interest resulting from the Deposit.  The Deposit will
> be held in escrow until: (i) Credited toward to the
> Sales Price at Settlement; (ii) All Parties Have Agreed
> in Writing As to Its Disposition; (iii) a court of
> competent jurisdiction orders disbursement and all
> appeal periods have expired; or, (iv) Disposed of in
> any other manner authorized by the laws and regulations
> of the appropriate jurisdiction.

[Emphasis added.] At the time he made the offer, Saenz intended
to pay the deposit amount to Southshore Title & Escrow, Inc.
("Southshore").  Bailey informed Saenz that there was no
objection to the title company holding the deposit instead of
Long & Foster.  Saenz told Bailey that he would send the deposit
check to the title company upon ratification of the offer, and he
sent her a copy of the check he would deposit.

No one ever accepted the offer within 48 hours as required
by the terms of the offer.  Nor did all of the parties
constituting the "Seller" agree to the terms of the offer without
modification.

On September 28, 2005, via a facsimile transmission bearing
a facsimile heading noting transmission from Long & Foster at
16:18, Saenz received from Bailey a note in which she advised
Saenz for the first time that "full ratification [of the offer]

4

is subject to Bankruptcy Court approval." Bearing a facsimile
heading noting a transmission from Long & Foster at 16:19 on the
same date of September 28, 2005 (one minute after the time of the
transmission of Bailey's note) is an altered version of Saenz's
offer (the "Toppelberg Version"). The Toppelberg Version was
obviously submitted well past the 48-hour deadline. Moreover,
the Toppelberg Version altered Saenz's offer by including the
handwritten addition: "contract subject to Bankruptcy Court
approval." Finally, the Toppelberg Version was not signed by all
of the parties identified as constituting the "Seller." Instead,
it bears only a handwritten notation that "Erma Miles [and]
Celestine Parker by Allan Toppelberg accept."

On October 3, 2005, again well past the 48-hour deadline,
Bailey transmitted to Saenz via facsimile transmission another
copy of the offer, this one bearing the signature of Theodore
Miles, but missing the signatures of the other parties
constituting the "Seller." Saenz never received any version of
his offer, altered or unaltered, bearing a signature by Ricardo
Miles or by Jeffrey M. Sherman as guardian *ad litem* for Ricardo
Miles.

Saenz contends that there was no meeting of the minds and
thus no contract for him to purchase the Property. He argues in
the alternative that if there was a contract that there was a
failure by the seller to comply with the terms of the contract.

Saenz also argues that he is entitled to summary judgment as to the plaintiff's fraud claim as he was not required to make a deposit until after ratification of his offer, which never occurred.

Because I conclude that no contract was formed, and that Saenz did not commit fraud with respect to the deposit, summary judgment in his favor is appropriate. Because there was never any contract, the failure of Long & Foster to obtain a deposit has caused the plaintiff no harm, and summary judgment is appropriate as to it as well.

II

Pursuant to Fed. R. Civ. P. 56 (as incorporated by Fed. R. Bankr. P. 7056), summary judgment will be granted where "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court must deny summary judgment where there is a genuine issue as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). If the movant makes a properly supported motion, the burden shifts to the opposing party to demonstrate specific facts showing that there is a genuine issue for trial. Id.

If the moving party does not bear the burden of proof at trial on an issue, summary judgment may be granted if the moving party shows "that there is an absence of evidence to support the

6

nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  This can be done by demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.  <u>Id.</u> at 331.  The court must view the opposing party's evidence in the light most favorable to non-movant's position and draw inferences in favor of that party, provided such inferences are justifiable or reasonable.  <u>Matsushita Elec. Indus. Co., Inc. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).

III

The parties disagree whether a valid and enforceable contract complying with the requirements of the Statute of Frauds existed with regard to the Property.  The Statute of Frauds provides:

> An action may not be brought . . . upon a contract or sale of real estate . . . unless the agreement upon which the action is brought is in writing and signed by the party to be charged therewith or a person authorized by him.

D.C. Code § 28-3502.  All material terms, including but not limited to subject matter, price, payment terms, quantity, duration, and so forth must be specified in the written agreement.

Saenz argues that there was no ratified contract for the following reasons: (1) the sellers added the material term "full ratification [of offer] subject to bankruptcy court approval",

7

resulting in a counteroffer which Saenz did not accept in writing
or otherwise; (2) the sellers failed to return the offer with the
48-hour response time, which was required by the terms of his
offer; and (3) not all of the persons having an interest in the
Property were named to or indicated written acceptance of Saenz's
offer, as required by the Statute of Frauds.

The plaintiff responds that the requirement of bankruptcy
court approval is not a material term that must be in writing.
According to the plaintiff, failure to comply with Saenz's 48-
hour acceptance deadline is not fatal to the formation of a
contract because Saenz did not specify "time is of the essence."
The plaintiff further responds that even if the bankruptcy court
approval term was material and the 48-hour acceptance deadline
were one Saenz would have been entitled to invoke, Saenz
subsequently acted as though a contract was in existence and thus
waived his right to contend that no contract existed based on
either the added material term or the lack of acceptance within
48 hours.  Moreover, contends the plaintiff, Saenz confirmed the
existence of a contract in writing when his attorney wrote a
letter terminating the contract and when he signed a release
noting the existence of the contract.  Finally, the plaintiff
contends that although not every owner was required to be a party
to the contract, and that each seller, or a person acting on
their behalf, did execute the contract.

IV

As explained below, no contract was ever formed because
Saenz never agreed in writing to the requirement that the sale be
approved by the bankruptcy court, which is a material term.  Of
the three sellers listed on Saenz's offer, only Erma Miles
(through her attorney Toppelberg) executed the Toppelberg
Version.  She never endorsed and delivered to Saenz a version of
the offer that did not contain the added requirement of
bankruptcy court approval.  Accordingly, unless the Toppelberg
Version was an acceptance of Saenz's offer, there was no
acceptance by all of the three parties constituting the Seller
under the proposed contract.  If the requirement of bankruptcy
court approval was a material alteration of Saenz's offer, the
Toppelberg Version was not an acceptance, and no contract was
formed.

A.

Saenz did not know about Miles' bankruptcy at the time he
made his offer.  Saenz first learned of the bankruptcy when
Bailey faxed her note on September 28, 2005, advising that "full
ratification [of Saenz's offer] is subject to bankruptcy court
approval."

Saenz also spoke on the telephone with Bailey about the
bankruptcy on September 28.  Saenz claims to have told Bailey at
that time that he was no longer interested in purchasing the

Property and that he did not consider a contract to exist.  He testified in his deposition that he told Bailey repeatedly during the telephone call on September 28, 2005, "I don't want anything to do with this property" because of the bankruptcy.  Bailey, at her deposition, disputed Saenz's deposition testimony, and claims she became aware that Saenz would not purchase the Property after receiving a letter from his attorney on November 1, 2005.

The existence of a dispute regarding whether Saenz stated that he would not purchase the Property if bankruptcy court approval was required is irrelevant.  The Statute of Frauds is precisely designed to avoid having the courts determine whether a contract for the purchase of real property existed based on what the parties orally stated.  A writing is required to form such a contract.

B.

The plaintiff erroneously contends that the requirement of bankruptcy court approval was not a material term.  A sale out of the ordinary course of business, as here, even if made subject to existing liens, can occur in a bankruptcy case only "after notice and a hearing . . . ."  11 U.S.C. § 363(b)(1).  Saenz learned of the requirement of bankruptcy court approval on September 28, 2005, the hearing to approve the sale did not occur until October 18, 2005, and an order approving the sale was not signed until January 11, 2006, well after Saenz's attorney transmitted a

10

letter on November 1, 2005, making clear that Saenz was no longer
interested in pursuing a purchase of the Property on the terms of
his original offer.

That a contract for sale of property is subject to
bankruptcy court approval is material given the uncertainty and
potential for delay that accompanies contracting with parties in
bankruptcy.  If a creditor or the trustee objects to the proposed
sale, a court may decline to approve or delay approval of the
sale for a number of reasons, such as the existence of a higher
offer for the subject property or even merely potential for
obtaining a higher offer.

Indeed the mere fact that a property is involved in a
bankruptcy is material as it affects the terms of any potential
buyer's offer.  A potential buyer may adjust offer terms, such as
offering a lower price, for property subject to bankruptcy
proceedings.  Saenz testified at his deposition that had he known
about the bankruptcy, he would have offered different terms, such
as a different price, and may not have even offered to purchase
the property at all.

By adding the requirement that "full ratification [of offer]
subject to bankruptcy court approval," the Toppelberg Version was
a counteroffer rather than an acceptance of Saenz's offer.  An
acceptance which includes a new material term operates as a
counteroffer and must be accepted by the original offeror in

11

order to form a binding contract.  Saenz purposefully did not
sign or initial the counteroffer indicating acceptance of the new
term.  There was, in short, no meeting of the minds agreeing to
all of the material terms of a contract.

C.

The plaintiff alternatively contends that Saenz continued
throughout October 2005 to act as if he intended to purchase the
Property, and by so acting waived the right to repudiate the
contract because of the addition of the material term of a
requirement of bankruptcy court approval.  Those acts include:
(1) requesting a title search on October 3, 2005; (2) arranging
for one or more appraisers to visit the Property on behalf of
himself in October 2005; and (3) waiting until November 1, 2005,
to formally announce that he would not purchase the Property by a
letter from his attorney, Richard G. Wise, transmitted to Bailey.

The plaintiff looks to K-Com Micrographics, Inc. V. NEDCO
(In re K-Com Micrographics, Inc.), 159 B.R. 61, 66-67 (Bankr.
D.D.C. 1993), to support his argument that Saenz waived his right
to invoke the Statute of Frauds as a defense.  In K-Com, an oral
contract existed between the debtor-plaintiff and lender-
defendant, and the court concluded that  K-Com, the debtor,
waived its right to insist on the lender's performance under the
contract by continuing to negotiate with the lender over the
period of a year-and-a-half regarding the terms of a

12

subordination agreement to be executed in favor of the lender
without ever demanding performance of or threatening to sue the
lender.  Id. at 67.

But a contract must exist before a party can waive any
right under the contract.  Because, here, the additional material
term was not accepted in writing by Saenz, no contract was ever
formed.[2]  Accordingly, K-Com is wholly inapposite to this case.

Absent a writing acquiescing in the new material term, Saenz
cannot be held on these facts to have entered into a contract for
the purchase of the Property.  Even if he had manifested an
intention to enter into a contract containing that new term,
either by way of oral communication or by way of taking
preparatory steps consistent with a contract being in existence,
that would not satisfy the requirement of a writing.

Moreover, Saenz disputes that ordering a title search or
arranging for an appraisal can be viewed as acquiescing in the
owners' counteroffer, and as proceeding as though a contract
existed.  He testified at his deposition that he initiated a
title search through Southshore and engaged an appraiser during
October 2005 because he continued to have an interest in the
Property.  He contemplated extending a lower offer on the

---

[2]  See part VII, below, for a discussion of my conclusion
that two writings signed by Saenz after execution of his offer
cannot be read as his agreeing to the addition of the requirement
of bankruptcy approval of the proposed sale or otherwise agreeing
to the formation of a contract with the sellers.

13

Property.  And he stated that he generally retained an interest
in the status of the Property as part of his profession.  It was
unreasonable for the owners to assume, based on acts that were at
best ambiguous, that Saenz intended to be bound by a contract
that he never accepted in writing.  They could have protected
themselves through the simple expedient of assuring that the
contract they believed existed was in a writing signed by all
necessary parties, but failed to take that simple, prudent step.

V

Additionally, no contract was ever formed because Saenz's
offer expired after the passage of 48 hours.  No one ever
accepted Saenz's offer within 48 hours as required by the terms
of the offer.  The plaintiff contends that the offer failed to
make time of the essence, but the offer had plainly expired after
the passage of 48 hours, and Saenz was free to treat the offer as
null and void.  In deciding whether to enforce a contract's
specified date for performance of an act, the law often inquires
whether time was of the essence with respect to enforcement of
the act.  Here, in contrast, we are dealing with the question of
whether a contract was formed, and Saenz's offer required
ratification within 48 hours, and expired after that 48 hours
passed.

14

Although the owners were free to sign the expired written

offer as a counteroffer, a binding contract would have then been

formed only if Saenz accepted the counteroffer.  As in the case

of the added term requiring bankruptcy approval, Saenz's

subsequent acts did not waive his entitlement to invoke the

Statute of Frauds as a defense.

VI

Not every individual who was listed as a Seller in Saenz's

offer delivered to him an executed version of the offer.  The

persons identified in Saenz's offer as comprising the Seller of

the Property were Erma Miles, Theodore Miles, and Ricardo Miles.

Saenz contends that the Statute of Frauds requires that all

parties to be bound by the writing by which real property is to

be purchased and sold must sign that writing.[3]  There is no

writing signed by or on behalf of all parties identified as the

Seller on the contract form which has all of the same terms as

Saenz's offer.  The version signed by Theodore Miles differs from

the Toppelberg Version.  Moreover, Ricardo Miles never delivered

---

[3]  Although Clementine Miles Parker also had an ownership
interest in the Property, the other three owners were free to
comply with a contract to sell the Property by having her execute
a deed to convey the Property to the purchaser.  Failure to list
her as a seller was not fatal to the formation of a contract.
Similarly, Gough's apparent interest (on the land records) in the
Property was eventually eliminated by court order, and thereafter
the owners were in a position to make good on a promised sale
free of Gough's interest.

15

a signed copy of Saenz's offer to Saenz.

Jeffrey Sherman states that he signed a copy of the contract in his capacity as guardian *ad litem* for Ricardo Miles and sent the executed copy to Bailey, but Saenz asserts that he was not aware of an offer being signed by Sherman, and there is no copy of a contract signed by Sherman in evidence.  Absent the delivery to Saenz of Sherman's acceptance of the offer, it is black letter law that no contract was formed.  Indeed, the offer itself provided at paragraph 26B that "[u]pon Ratification and **Delivery**, this Contract becomes a legally binding agreement."  (Emphasis added.)[4]

VII

Despite the failure of the three sellers to accept Saenz's offer, the plaintiff points to two written documents signed by or on behalf of Saenz as evidencing the existence of a contract, meaning one requiring bankruptcy court approval.

---

[4]  Saenz alternatively contends that the plaintiff breached the contract (if one was formed) because there were title defects that the sellers would have been unable to correct and were unable to secure bankruptcy court approval in order to comply with the October 31, 2005 closing deadline specified in the contract.  But for the reasons stated in my oral decision, I am of the preliminary view that Saenz cannot prevail on that ground as Saenz, not the sellers, breached the contract (if one was formed) by failing to schedule the closing, as required by the contract, and by declaring the contract terminated.  The evidence suggests that the sellers could have corrected any title problems by any closing date Saenz set, had he set one.  Once Saenz repudiated the contract, they were excused from performance.

A.

The first of these is a letter of November 1, 2005, written by Saenz's attorney, Richard G. Wise, and transmitted to Bailey. Wise's letter proceeds on the erroneous assumption that Bailey still held Saenz's deposit, and it demands a refund of the deposit.  Entitled "Notice of Termination of Contract for Purchase of [the Property] and Demand for Refund of Deposit," the letter recites:

> This firm represents Mr. Carlos Saenz in connection with that certain **Regional Sales Contract (the "Contract") dated September 21, 2005 between Erma G. Miles, Theodore Miles and Ricardo Miles (collectively, "Seller") and Mr. Saenz ("Purchaser") relating to the [P]roperty** . . . .
>
> The purpose of this letter is to communicate to you on behalf of Mr. Saenz that the Seller is in default under the terms of the Contract in a way which cannot be cured, resulting in the need for Mr. Saenz herewith to provide you with notice of his termination of the Contract as being void on account of Seller's default.
>
> The Contract called for closing on the purchase under the Contract to occur on or before October 31, 2005. . . .  That deadline came and passed yesterday. There was no closing on the Contract on or before October 31, 2005.  To our knowledge, no one has ever called Mr. Saenz (or otherwise provided written notice to him) to schedule closing under the Contract for a date on or before October 31, 2005.  Mr. Saenz was a ready, willing and able purchaser of the Property under the Contract, in accordance with the terms of the Contract, and is it not in default in any respect under the Contract.
>
> The deadline for closing under the Contract was a material term of the Contract, resulting in the Seller now being in material breach of the terms of the Contract for failing [to] go to closing on the sale of the Property on or before the specified deadline. Since this material breach of the Contract cannot be cured, we are providing notice on behalf of Mr. Saenz

17

of the termination of the Contract and respectfully
request a refund of the Deposit of $125,000 previously
paid by Mr. Saenz.

Sellers also in default under the Contract by
reason of Seller's failure on repeated occasions to
provide access to the Property for Purchaser for the
purpose of conducting appraisals of the Property. . . .

It is perhaps appropriate to note in this context
that **when the terms of the Contract were negotiated and
agreed to with Mr. Saenz, no mention was made that the
Property was the subject of litigation.**  No one advised
to Saenz, and the Contract does not provide, as far as
we are aware, that any court approval of the Contract
was a condition of going to closing under the Contract.

Your refund or Mr. Saenz's Deposit may be sent to
my attention for forwarding to Mr. Saenz.  As you know,
under provision #25 of the Contracts, Mr. Saenz will be
entitled to recovery of his expenses, including legal
fees, in the event of an unjustified failure to refund
the Deposit to Mr. Saenz.

Please note that under provision #25 of the
Contract, Mr. Saenz retains all of his legal and
equitable remedies.

[Emphasis added.]  The only document dated September 21, 2005,

was Saenz's offer on Long & Foster's standard Regional Sales

Contract form.  The letter defines the term "Contract" as meaning

that offer, not some actual contract.  By stating that "when the

terms of the Contract were negotiated and agreed to with Mr.

Saenz, no mention was made that the Property was the subject of

litigation," the letter makes clear that it is referring to

Saenz's offer, made on September 21, 2005, not some other offer

made after Saenz later learned of the bankruptcy case that

attempted to add bankruptcy court approval as a term.

The letter cannot be taken as agreeing to the addition of a

requirement of bankruptcy approval of the proposed sale--it makes

clear that such a term was not part of what Saenz agreed to--and

without Saenz ever having agreed in writing to that term, no

contract was ever formed.  By stating that Saenz never agreed to

bankruptcy court approval as a requirement, Wise's letter is

inconsistent with an intention to acknowledge the existence of an

enforceable contract containing such a term.

The letter must thus be read as terminating Saenz's offer

(the "Contract").  To the extent that the letter refers to

breaches of obligations under the Contract, it can be read as

stating that the offer, even if Saenz were willing to enter into

a contract, imposed obligations that Saenz viewed the sellers as

having breached.  Wise's letter was making clear that Saenz no

longer had an interest in pursuing a purchase of the property

when the sellers were not prepared to meet what Saenz viewed as a

deadline for closing that could not be achieved because the

sellers were insisting on an approval by the bankruptcy court (a

term never agreed to by Saenz) that stood as an obstacle to

meeting the deadline.

B.

The second document is a Long & Foster Release Agreement

form executed by Saenz that would have been effective only if

executed by the sellers as well.  As such, it was an offer to

compromise that is inadmissible under Rule 408 of the Federal

Rules of Evidence to prove that the sellers' claim that an actual

19

contract existed when Saenz had taken the position that he never
agreed to the requirement of bankruptcy court approval.  In any
event, Saenz's signing of the Release Agreement form can only be
viewed as expressing an intention to enter into a Release
Agreement under which the sales contract referred to would be
declared null and void (which is inconsistent with agreeing that
a contract would be treated as in existence).  It cannot be read
as acknowledging the existence of a contract if the sellers did
not also execute the Release Agreement and thereby agree to treat
any contract (if one existed) as now null and void.

VIII

There remains the fraud claim against Saenz for failing to
make a deposit as required by the terms of his offer.  The offer
itself contains a reference to a deposit as having been made, but
Bailey (the sellers' agent) knew that the deposit had not yet
been made at the time of the offer.  Saenz told Bailey (the
sellers' agent) that he would send the deposit check to the title
company **upon ratification of the offer**.  That he sent her a copy
of the check he intended to deposit upon ratification cannot be
treated as a communication that he would no longer wait for
ratification before transmitting the deposit check to the title
company.  There was no fraud.

Moreover, this is a case of no harm, no foul.  The offer
contemplated that any deposit made would be placed into escrow

20

for the protection of the sellers **only upon ratification of the
offer**.  Because Saenz's offer was not timely accepted, it became
null and void 48 hours after he made the offer, and ratification
never occurred.  Saenz's failure to make a deposit could not have
harmed the sellers because Saenz would plainly have been entitled
to a return of any deposit made upon the offer becoming null and
void and ratification never having occurred.  At that juncture,
he was entitled to destroy the check (or to have any other entity
in possession of the check destroy it) or to have instructed his
bank to stop payment on the check.  Because no contract
materialized once the sellers failed to accept Saenz's offer
within 48 hours, no right to a deposit arose.  There being no
right to a deposit, the absence of a deposit upon Saenz's offer
expiring could not, as a matter of law, have caused them any
harm.

IX

The plaintiff pressed claims against Long & Foster as well
relating to the deposit and the failure to complete a sale.  But
without a contract having been formed between Saenz and the three
sellers, those claims are invalid.

A.

First, the plaintiff contends that Long & Foster, as the
sellers' agent, breached its contractual obligations and
committed negligence by reason of Bailey's having failed to

21

obtain a deposit from Miles.  As noted with respect to the fraud claim against Saenz, the offer contemplated that any deposit made would be placed into escrow for the protection of the sellers **only upon ratification of the offer**.  The sellers' right to be protected by a deposit would only have arisen had they accepted Saenz's offer.  Once Saenz's offer expired because the sellers failed timely to accept the offer within 48 hours after it was made, Bailey would have been obligated to return to Saenz any check deposited, without cashing the same.  Had Bailey returned any deposit at that point, the sellers would have been in the exact same position they are in now: no deposit would be on hand.

The failure to obtain a deposit, as a matter of law, could not have caused the sellers any harm.  Bailey took the risk that if a contract *were* formed, her failure to have obtained a deposit might expose her to a damage claim if the sellers sought recovery from the required deposit as a means of recovering for breach of the contract.  But a contract was never formed.  Accordingly, Long & Foster cannot be held liable for failing to procure a deposit that was to be placed into escrow for the sellers' protection only upon ratification of Saenz's offer.  Without a contract having been formed, the sellers had no rights to a deposit being on hand.

B.

The plaintiff also asserts a claim that Long & Foster breached its contractual obligations as the sellers' agent, and committed negligence, by failing to notify the sellers that no deposit had been obtained.  But once Saenz's offer was not accepted within 48 hours, the potential right to have a deposited check cashed and placed in escrow for their protection evaporated because the offer was not ratified.  At any point, Long & Foster rightfully could have destroyed the check (or Saenz could have stopped payment on the check) based on no contract being formed. The failure of Bailey to advise that no deposit had been received cannot be grounds for a claim, whether based on contract or negligence.  Because there was no right for a check to remain on hand, Bailey's leading the sellers to think that a deposit was made is inconsequential.[5]  As a matter of law, no harm arose from the failure of Bailey to tell the sellers that no deposit was

---

[5]  If a contract *had* been formed, then Bailey's failure to advise the sellers that no deposit had been received could give the sellers no greater an entitlement to relief than if Long & Foster had received a deposit and had destroyed it.  But if no contract was formed, Long & Foster could not be held liable for having destroyed a deposit received: Long & Foster could not be held liable for having correctly forecasted that the court would conclude that no contract was formed.  That would be a risky approach for Long & Foster to take, but once the court concluded that no contract was formed, Long & Foster could not be held liable for depriving the sellers of a deposit to which they were not entitled.  It follows that failure to advise the sellers that no deposit was received similarly cannot state a valid claim when no contract was ever formed.

23

made.

C.

The plaintiff also asserts that Long & Foster negligently
failed to schedule a closing on the sale of the Property, but
without a contract having been formed, there was no agreed sale
to schedule.

D.

Finally, the plaintiff contends that Long & Foster committed
negligence by requesting the plaintiff to release the deposit to
Saenz.  But the plaintiff never agreed to release any deposit,
and no contract was formed that entitled the plaintiff to have a
deposit on hand.

X

Because the plaintiff's claims against Long & Foster are
being dismissed, that moots the cross-claim of Long & Foster
against Saenz seeking to be indemnified for any recovery by the
plaintiff against Long & Foster (including mooting the question
of whether there is subject matter jurisdiction to hear that
cross-claim).  As to Long & Foster's cross-claim based on a
provision of Saenz's offer calling for him to pay Long & Foster's
attorney's fees in any litigation in which judgment is not
entered against Long & Foster, that cross-claim fails because
Saenz's offer never became a contract pursuant to which the
offer's terms became binding on Saenz.

24

XI

Long & Foster counterclaimed against the plaintiff for indemnification pursuant to the terms set forth in Saenz's offer calling for indemnification by Saenz and the sellers of Long & Foster with respect to its attorney's fees in the event that it was made a party to any litigation (unless judgment were entered against Long & Foster).  But because the sellers never formed a contract by accepting Saenz's offer, the terms of that offer never became binding on the sellers.  Accordingly, the counterclaim of Long & Foster will be dismissed as well.

XII

For the reasons set forth above, the court will grant summary judgment in favor of defendants Saenz and Long & Foster dismissing the claims made against them.  The court will also dismiss Long & Foster's counterclaim against the plaintiff.  A judgment follows.

[Signed and dated above.]

Copies to: All counsel of record; Office of United States Trustee.

25